IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES E. MILLER, JR.,

    Plaintiff,

v.

MADISON COUNTY JAIL,
ROBERT HERTZ, and
JOE GULASH,

    Defendants.    Case No. 07-cv-154-DRH

**STATEMENT OF REASONS**

**HERNDON, Chief Judge:**

### I. Introduction

On April 5, 2010, the United States Court of Appeals for the Seventh Circuit issued an order (Doc. 59) remanding this case for the limited purpose of requesting that the district court provide a statement of reasons for granting Defendants' Motion for Summary Judgment (*see* Docs. 39, 43 & 44). The Seventh Circuit's order arises from Plaintiff's *pro se* Motion to Proceed In Forma Pauperis ("IFP") on Appeal,[1] as Plaintiff intends to appeal the Court's entry of summary

---

[1] Plaintiff initially filed the IFP Motion (Doc. 52) with this Court, as is proper to do. However, the Court denied the Motion without prejudice for Plaintiff's failure to include the requisite certified copy of his prison trust account statement for the preceding six months or his sworn affidavit (Doc. 53). Plaintiff filed a Motion to Renew his IFP Motion (Doc. 54), which the Court again denied for his continued failure to provide the requisite items (Doc. 55), whereby the Court instructed Plaintiff that he could then attempt to request leave to appeal IFP directly with the Seventh Circuit.

judgment against him.

Plaintiff James E. Miller, Jr., acting *pro se*, filed suit against defendants Madison County Jail,[2] Robert Hertz and Joe Gulash for civil rights violations pursuant to **42 U.S.C. § 1983**, specifically asserting a substantive due process claim under the Fourteenth Amendment that the conditions of his confinement as a pretrial detainee amounted to cruel and unusual punishment. Plaintiff alleged that Defendants unnecessarily kept him on suicide watch for the two years he was housed at Madison County Jail awaiting trial, as a doctor and social worker had declared that Plaintiff was no longer suicidal. Plaintiff alleges Defendants further added to his injury by refusing to allow him a mattress in his cell for an entire year, forcing him to sleep on the concrete cell floor, as well as denying him other small comforts to which he believes he was entitled, all because of being kept on suicide watch. In support of summary judgment, Defendants argued that the evidence showed they did not act with the requisite deliberate indifference and that Plaintiff had also failed to show defendant Hertz's personal involvement necessary for individual § 1983 liability or to demonstrate the existence of an official policy or widespread custom for official liability.

On August 3, 2009, the Court conducted a hearing on Defendants' Motion for Summary Judgment. Counsel was present for defendants Hertz and

---

[2] Madison County Jail was dismissed as a Defendant in this case on August 16, 2007, the Court finding that Plaintiff had failed to allege that his constitutional deprivations were the result of an official policy, custom or practice of the municipality (Doc. 8, p. 5).

Gulash. Plaintiff, acting *pro se*, was present via the Court's video teleconferencing system from Menard Correctional Center, where he is currently housed. After reviewing the summary judgment motion, Plaintiff's Response, and Defendant's Reply thereto, along with the attached exhibits and deposition transcripts, and after taking into account the Parties' oral arguments, at the end of the motion hearing the Court granted summary judgment in favor of defendants Hertz and Gulash, finding that there was no existing question of material fact as to the issue of whether Defendants acted with deliberate indifference. This ruling was made on the record. However, because a transcript of the hearing was not requested by the Parties and therefore, not available as part of the record for the Seventh Circuit's review, the Court now memorializes its ruling herein, in this Statement of Reasons, as ordered by the Seventh Circuit.

## II. Legal Standard

Upon hearing arguments from both sides, the Court began its determination of the issues by reciting the applicable legal standard for summary judgment motions. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *see Celotex Corp. v. Catrett,* **477 U.S. 317, 322 (1986);** *Spath v. Hayes Wheels Int'l-Ind., Inc.,* **211 F.3d 392, 396 (7th Cir. 2000)**. In determining the existence

of a genuine dispute of material fact, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. ***See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath,* 211 F.3d at 396**. If the moving party meets its burden, the nonmoving party has the burden "to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." ***Borello v. Allison,* 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex,* 477 U.S. at 322-26; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996)**.

The Court next discussed the requisite legal standard for Plaintiff to prevail on his Section 1983 claims. Pretrial detainees are protected by the Fourteenth Amendment's (substantive) due process clause, rather than the Eighth Amendment's prohibition against cruel and unusual punishment, which applies to convicted persons. ***Collignon v. Milwaukee County*, 163 F.3d 982 986-87 (7th Cir. 1999); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979)**. Still, the Court of Appeals for the Seventh Circuit has noted that, as a practical matter, there is little difference between the applicable standards for liability. ***Collignon*, 163 F.3d at 988-89**. The "deliberate indifference" standard associated with the Eighth Amendment is used to analyze the conduct of prison officials for purposes of the Fourteenth Amendment – specifically with respect to medical and segregation decisions of the type presented in this case. ***Id.*** In ***Farmer v. Brennan,* 511 U.S.**

**825 (1994)**, the Supreme Court described "deliberate indifference" as a subjective standard greater than negligence, the equivalent of recklessness in the criminal law sense– ignoring a known risk. ***Farmer*, 511 U.S. at 837**.

The due process clause protects against unlawful restraint. ***Collignon*, 163 F.3d at 987**. Pretrial detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." ***Youngberg v. Romeo,* 457 U.S. 307, 321-22 (1982); *see also Zarnes v. Rhodes*, 64 F.3d 285, 289 (7th Cir. 1995)**. In either situation, certain restrictions may still be placed on the rights of pretrial detainees because government officials have legitimate interests in managing the facility where an individual is detained. As long as these measures are reasonably related to the effective management of the confinement facility, they are not considered punishment for a crime the detainee is suspected of committing. ***Rapier v. Harris,* 172 F.3d 999, 1002-03 (7th Cir. 1999)**.

The appellate court has recognized that prison officials cannot punish pretrial detainees, but at the same time they are obligated to keep detainees safe and to provide adequate medical care. ***See Collignon*, 163 F.3d at 987-88; *Sullivan v. Bornemann*, 384 F.3d 372, 377 (7th Cir. 2004); *Estate of Cole v. Fromm,* 94 F.3d 254, 259 (7th Cir. 1996)**. In the Eighth Amendment context, the Court of Appeals for the Seventh Circuit has specifically stated: "Suicide is a 'serious harm' and prison officials must take reasonable preventive steps when they are aware that

there is a substantial risk that an inmate may attempt to take his own life." ***Estate of Novack v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)**.

### III. Findings of Fact

1. On May 14, 2003, Plaintiff was housed in the Madison County Jail, on two counts of murder, facing a life sentence or possibly even the death penalty.

2. On August 5, 2003, Plaintiff attempted to commit suicide by hanging himself using a braided rope. He also tied his cell door shut so rescuers would have a difficult time trying to reach him.

3. On that same date, Dr. Kenneth Gilbert evaluated Plaintiff after his suicide attempt. He diagnosed Plaintiff as having severe depression and post-traumatic stress disorder, among other things. Standard suicide precautions were then ordered. Dr. Gilbert questioned whether the suicide was due to depression or was a "rational suicide," so called based on an assessment of Plaintiff's probable prison term. Plaintiff acknowledged the correctness of this diagnosis and recommendation.

4. As part of the suicide precautions, Plaintiff was placed in an isolation cell and stripped naked, with no mattress or personal property. Plaintiff acknowledges that prison officials did clean his cell.

5. On August 10, 2003, Catherine Wade, Licensed Clinical Social Worker ("LCSW"), evaluated Plaintiff and wrote a memorandum to Captain Gulash. She did not believe Plaintiff was a danger to himself, at least relative to having a mattress and

sleeping bag and being off suicide watch. However, Wade specifically limited improving Plaintiff's living conditions to the aforementioned improvements.

6. Catherine Wade's progress notes indicated that Captain Gulash had decided to keep Plaintiff on suicide watch, due in part to his discussion with an unnamed social worker on the death penalty panel. Wade, however, did not consider Plaintiff to be currently suicidal.

7. On August 21, 2003, Dr. Daniel J. Cuneo, Ph.D. (clinical psychologist), evaluated Plaintiff at the request of Circuit Judge Hackett to determine Plaintiff's fitness to stand trial. While Plaintiff was found fit to stand trial, Dr. Cuneo noted that Plaintiff admitted to hearing voices, was paranoid, had a history of psychiatric issues, was extremely depressed, and turned his depression and anger inward by way of multiple suicide attempts (some manipulative). Plaintiff's history of refusing medication was noted. Dr. Cuneo opined that Plaintiff remained a high suicide risk, with a very high potential for acting out against himself. Dr. Cuneo therefore recommended continued suicide precautions.[3]

8. On August 29, 2003, Captain Gulash issued a memorandum to Jail personnel, explaining that based on the recommendation of the medical staff, Plaintiff's possessions should be limited to two sleeping bags, a Bible, and one suicide suit, and that his mail should be saved up until his attorney or social worker visits. Special precautions regarding serving plaintiff's meals were also taken.

---

[3] Plaintiff takes issue with reliance on Dr. Cuneo's report because it was for purposes of assessing his fitness to stand trial, not his conditions of confinement, although in his deposition he acknowledged that part of Dr. Cuneo's assessment was also done to assess his suicide risk.

9. On August 30, 2003, Catherine Wade, LCSW, noted that she spoke to Plaintiff regarding Dr. Cuneo's position that Plaintiff be kept on suicide watch until trial. She considered Plaintiff to be aware of the nuances of responsibility and accountability, and noted that Plaintiff continued on suicide watch with no mattress.

10. Dr. Gilbert assessed Plaintiff on November 24, 2003 and noted that he still had a suicide plan. Dr. Gilbert recommended Plaintiff be admitted to a forensic hospital rather than being kept in continued isolation.

11. On January 5, 2004, Dr. Gilbert noted that Plaintiff had refused medication three times in the last month. It was also noted that Plaintiff had no current suicidal tendencies or a suicide plan. Dr. Gilbert considered it time to reconsider the suicide watch, but to return to suicide watch if Plaintiff refused medication. With that said, Dr. Gilbert also recommended continuing Plaintiff in segregation status.

12. On February 5, 2004, Dr. Michael Armour, Ph.D. (psychologist), evaluated Plaintiff regarding his current level of suicidal ideation and security needs. Dr. Armour opined that Plaintiff no longer needed to be in an isolation cell. Plaintiff denied suicidal ideations and he was, at that time, regularly taking his medications. But, Dr. Armour observed that Plaintiff still posed some security concerns, due to his history of self-harm. A one or two-man cell was deemed appropriate, at a lower security level – all on the condition that Plaintiff continue to take his medications, otherwise he should return to an isolation cell.

13. Plaintiff's criminal defense attorney wrote to Sheriff Hertz in a letter,

dated February 18, 2004. The attorney questioned why Plaintiff was still housed in an isolation cell when Dr. Armour had opined that Plaintiff could be housed in a one- or two-man low security cell, if Plaintiff continued to take his medication.[4]

14. Dr. Gilbert's February 22, 2004 assessment reflected that the doctor thinks Plaintiff needed stimulus, such as mail or a newspaper. It is also noted that Plaintiff had punched the officer who escorted him back to segregation. Plaintiff's deposition testimony indicates Captain Gulash explained that he feared Plaintiff would make a weapon out of mail, but Gulash eventually allowed Plaintiff to have some magazines.

15. Captain Gulash wrote a memorandum to Chief Deputy Fisher, dated April 2, 2004, regarding Plaintiff. The memorandum stated that Plaintiff remained on lockdown, except for one hour per day in the day room. Captain Gulash cited Dr. Cuneo's report and recommendations as the basis for his decision not to give Plaintiff a mattress and for the continued use of suicide precautions. Gulash noted Dr. Gilbert's differing opinion. Gulash also recommended a possible follow-up evaluation by Dr. Cuneo.

16. Dr. Gilbert reported, on April 5, 2004, that he did not find Plaintiff to be suicidal. The doctor also noted that Plaintiff no longer needed to be in segregation.

17. Captain Gulash thereafter wrote a memorandum to file, dated July 15,

---

[4] There is an unsigned notation on the letter indicating the letter was forwarded to Captain Bunt for review and respond to Plaintiff's criminal attorney.

2004, which stated that Dr. Cuneo no longer found a problem with allowing Plaintiff the use of a mattress, so Gulash approved providing Plaintiff with a mattress for his cell.

18.  A search was conducted of Plaintiff's cell on March 30, 2005. By Plaintiff's own admission, he revealed that he possessed a host of personal items–which Plaintiff explains were permitted by friendly guards. Plaintiff also acknowledged in his deposition that he made commissary purchases between August 2003 through September 2005.

19.  On April 26, 2005, Captain Gulash wrote a memorandum to Jail personnel regarding Plaintiff, which stated that after meeting with Plaintiff's attorney and a defense social worker, Gulash approved Plaintiff being allowed to possess legal materials in his cell, as well as legal mail.

20.  On June 22, 2005, Plaintiff was again evaluated by Dr. Cuneo, in order to provide an updated report to Circuit Judge Hackett regarding Plaintiff's fitness to stand trial, his current suicide risk, and housing requirements while being detained in jail, awaiting to stand trial. Dr. Cuneo reported that Plaintiff's audio hallucinations continued and Plaintiff remained non-compliant with taking medications. Although Dr. Cuneo found that Plaintiff was not imminently suicidal at the time, Plaintiff continued to remain a high suicide risk. Again, the doctor noted Plaintiff's tendency to turn his anger and frustration inward. Dr. Cuneo echoed Dr. Armour's opinion that Plaintiff could be moved from the isolation cell to the Special Housing Unit (SHU), but not to general population, if Plaintiff continued to take his

medication. However, Dr. Cuneo recorded that Plaintiff remained non-compliant with his medication routine. Dr. Cuneo also commented that Plaintiff did not actually want to be moved to the SHU, but wanted to be in general population housing instead. During his deposition, Plaintiff admitted to not always taking his medication.

21. According to a memorandum, dated May 23, 2005, from Captain Gulash to Jail staff, inmates are housed in the SHU only upon the recommendation of medical/mental health personnel. Inmates in the SHU may have a regular jail-issued jumpsuit (but no underwear), regular footwear, a mattress, a safety sleeping bag, paper materials and newspapers, a pencil, and specified commissary items.

### IV. Conclusions of Law

22. The violation of a prison policy does not, by itself, establish a constitutional violation. *See Bradich ex rel. Estate of Bradich v. City of Chicago*, **413 F.3d 688, 690 (7th Cir. 2005) (citing *Collins v. Harker Heights*, 503 U.S. 115, 122-124 (1992))**. Therefore, any argument Plaintiff advances regarding Defendants' violation of a prison policy is not, by itself, deemed to be a constitutional violation.

23. Under the law of this Circuit, suicide is considered to be a "serious harm," which prison officials must reasonably attempt to prevent if they are aware such a substantial risk exists that an inmate may try to commit suicide. *Estate of Novack v. County of Wood*, **226 F.3d 525, 529 (7th Cir. 2000)**.

24. In this case, it is clear that conflicting professional opinions existed as to Plaintiff's propensity to commit suicide following his attempt on August 5, 2003. In addition to these conflicting professional opinions was the fact that Plaintiff did not consistently take his prescribed medication. All of the professionals who evaluated Plaintiff considered him to be a suicide risk. Drs. Gilbert and Armour considered him to be a high suicide risk, particularly if Plaintiff was not taking his medication as prescribed. Further, at all times Dr. Cuneo considered Plaintiff to be a high suicide risk. Therefore, Captain Gulash's reaction to the clear indication of Plaintiff's high suicide risk would not amount to deliberate indifference or some form of punishment. The situation is just the opposite – Plaintiff complains that too many precautions were taken to alleviate the substantial risk that he would once again attempt suicide while in custody of the Madison County Jail.

25. The ultimate determination regarding the seriousness of an injury is best left to a healthcare professional. ***Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991)**. The fact that Captain Gulash decided to accept the opinion of Dr. Cuneo – who recommended the most conservative approach among the medical professionals to ensuring Plaintiff's safety – also does not amount to deliberate indifference, particularly considering that the other medical professionals who evaluated Plaintiff only stated that lesser restrictions would be appropriate on the condition that Plaintiff continued to take his medication. Further, any disagreement among medical professionals, and acceptance of one medical professional's opinion over another

does not amount to deliberate indifference. ***See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976))**. The record shows that Plaintiff did not stay on his prescribed medication, he acted out against prison staff, such as when he assaulted a guard, and he admitted to hearing voices. The record also shows that Captain Gulash was never deliberately indifferent therefore, to either providing Plaintiff with his medical needs or tending to his basic needs (*see supra*, ¶¶ 18, 19 & 21).

26.  Certainly, no element of punishment existed with respect to keeping Plaintiff in insolation longer than was necessary. His right to essentially be free from being on suicide watch for two years as a pretrial detainee was trumped by Plaintiff's right to his personal safety. ***See Fromm*, 94 F.3d at 262**. Captain Gulash acted in accordance with his responsibility to ensure Plaintiff's safety while he was housed in Madison County Jail as a pretrial detainee.

27.  ***Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)**, stressed that "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a [Section] 1983 action unless he caused or participated in an alleged constitutional deprivation." ***See also McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982)**. There is likely no indication on the record that Sheriff Hertz was involved in the actual decisions to keep plaintiff in an isolation cell. However, the Court will apply the same rationale to Sheriff Hertz as it has applied regarding Captain Gulash, finding that neither acted

towards Plaintiff with deliberate indifference. Therefore, the Court need not reach the issue of whether *respondeat superior* or official capacity liability exists with respect to either Defendant.

### V. Conclusion

In sum, because the Court found no evidence that either defendant Sheriff Hertz or Captain Gulash acted with deliberate indifference towards Plaintiff or with the intent to punish him, in either their individual or official capacities, it granted Defendants' Motion for Summary Judgment (Doc. 39). Accordingly, summary judgment was entered in favor of defendants Hertz and Gulash and against Plaintiff (Doc. 44). This Statement of Reasons hereby constitutes the Court's rationale for doing so.

The Clerk of the Court is hereby **DIRECTED** to transmit a copy of this Statement of Reasons to the United States Court of Appeals for the Seventh Circuit.

**IT IS SO ORDERED**.

Signed this 14th day of April, 2010.

/s/ David R Herndon
**Chief Judge**
**United States District Court**